# UNITED STATES DISTRICT COURT

for the
District of Colorado

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>An iPhone, red color, in a clear case, a Galaxy S7 edge cellular phone, IMEI: 359471070901384, and a red thumb drive with letters "DD" on the exterior of the drive, held in evidence and associated with ATF case 788010-21-0010, currently stored in the ATF Evidence Vault and more fully described in Attachment A, attached hereto. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No.   1:21-sw-1208-NYW |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the   State and   District of   Colorado   *(identify the person or describe property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit
The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit
The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

X   evidence of a crime;

X   contraband, fruits of crime, or other items illegally possessed;

X   property designed for use, intended for use, or used in committing a crime;

☐   a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of   18   U.S.C. §§ 922(a)(1)(A), and the application is based on these facts:

X   Continued on the attached affidavit, which is incorporated by reference.

☐   Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/ Joel Hegarty* .
*Applicant's signature*

Special Agent Joel Hegarty, ATF
*Printed name and title*

Sworn to before me and:    ☐   signed in my presence.
☒   submitted, attested to, and acknowledged by reliable electronic means.

Date:   **30 Nov 2021**

*Judge's signature*
Nina Y. Wang
United States Magistrate Judge
*Printed name and title*

City and state:   Denver, CO

**ATTACHMENT A**

**DESCRIPTION OF LOCATION TO BE SEARCHED**

Luis Daniel MARQUEZ Cellular Phones and Thumb Drive (hereinafter and in Attachment B the "Device(s)")

1.  Red in color iPhone,



2.  A Galaxy S7 edge cellular phone, IMEI: 359471070901384,



1

3. A red thumb drive with letters "DD",



## ATTACHMENT B

## <u>DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED</u>

For the Device(s) listed and described in Attachment A, the following items, that constitute evidence of the commission of, contraband, the fruits of crime, or instrumentalities of violations of 18 U.S.C § 922(a)(1)(A) willfully engaging in the business of manufacturing or dealing in firearms without a license, (hereinafter "Subject Offenses"):

1. Any and all information, notes, software, documents, records, or correspondence, in any format and medium, pertaining to violations of Subject Offenses:

2. Any and all address books, names, and lists of names and addresses of individuals who may have been contacted by use of the Device(s) or by other means for the purpose of committing violations of Subject Offenses.

3. Any and all information, records, documents, invoices and materials, in any format or medium, that concern any accounts with an Internet Service Provider pertaining to violations of Subject Offenses.

4. Any and all information, records, documents, invoices and materials, in any format or medium, that concern e-mail accounts, online storage, or other remote computer storage pertaining to violations of Subject Offenses.

5. Records of Internet activity, including Internet Protocol addresses, firewall logs, transactions with Internet hosting providers, co-located computer systems, cloud computing services, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses pertaining to violations of Subject Offenses or that show who used, owned, possessed, or controlled the Device(s).

6. Any and all information, documents, records, photos, videos, or correspondence, in any format or medium, pertaining to use or ownership of the Device(s), or that aid in the identification of persons involved in violations of Subject Offenses.

7. Credit card information, bills, and payment records pertaining to violations of Subject Offenses.

8. Descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to violations of Subject Offenses.

9. Evidence of who used, owned, or controlled the Device(s) to commit or facilitate the commission of the crimes described, or at the time the things described in this warrant were created, edited, or deleted, including photographs, videos, logs, call logs, phonebooks, address books, contacts, IP addresses, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, search terms, metadata, user profiles, e-mail, e-mail contacts, messages (text or voice), instant messaging logs, file structure and correspondence.

10. Evidence of software that may allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security provisions or software designed to detect malicious software or unauthorized use of the device, and evidence of the lack of such malicious software.

11. Evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence.

12. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s).

13. Evidence of how and when the Device(s) were used or accessed to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

14. The telephone number, ESN number, serial number, and/or SIM card numbers of or contained in the Device(s).

15. Passwords, encryption keys, and other access devices that may be necessary to access the Device(s).

16. Contextual information necessary to understand the evidence described in this attachment.

17. Executing law enforcement personnel are authorized to depress the fingerprints and/or thumbprints of persons reasonably believed to be the user(s) of the Device onto the Touch ID or fingerprint sensor of any Apple iPhone, iPad, or other Apple brand device, or other device that has a fingerprint sensor, in order to gain access to the contents of any such device. Law enforcement personnel may also depress the fingerprints and/or thumbprints of persons reasonably believed to be the user(s) of the Device in order to gain access to applications on the device that may be locked with a fingerprint or thumbprint.

DEFINITIONS:

18. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

**AFFIDAVIT**

I, Joel N. Hegarty,  being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

**INTRODUCTION AND AGENT BACKROUND**

1.  Your affiant, Joel N. Hegarty, is a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms and, Explosives (ATF), United States Department of Justice, Denver, Colorado. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States empowered by law to conduct investigations of, and to make arrests for, offenses enumerated by statute in the United States Code. I am authorized under Federal Rule of Criminal Procedure 41(a)(1)(C) as a federal law enforcement officer who is engaged in enforcing the criminal laws, and am within any category of officers authorized by the Attorney General to request a search warrant.

2.  I have been employed as a Special Agent with ATF since February 2020. My primary duties consist of the enforcement of federal firearms laws, armed narcotics traffickinglaws , and conspiracy laws and have conducted numerous investigations regarding these laws as an ATF Special Agent. Prior to graduating from the Federal Law Enforcement Training Center in 2020 and becoming an ATF Special Agent, I was employed with Ernst and Young for over 4 years, working as a Senior Forensic Accountant in Ernst and Young's forensic accounting practice. I have participated in the execution of multiple federal and state search warrants involving violent crime, organized crime, illegal firearms possession, and the use and trafficking of narcotics.

3.  As an ATF Special Agent, I am familiar with federal criminal laws pertaining to narcotics violations. I know it is a violation of 18 U.S.C. § 922(a)(1)(A) to willfully engage in the business of dealing in firearms without a license.

4.  This affidavit is submitted in support of an application for a search warrant for computers and related equipment (more fully described in Attachment A), and the data located therein, there being probable cause to believe that located in the place described in Attachment A are items described in Attachment B, being evidence, fruits, and instrumentalities of violations of 18 U.S.C § 922(a)(1)(A) wilfully engaging in the business of manufacturing or dealing in firearms without a license.

5.  Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of 18 U.S.C § 922(a)(1)(A) are located in the place described in Attachment A.

6.  The information contained within the affidavit is based on my training and experience, as well as information imparted to me by other law enforcement officers involved in this investigation.

**IDENTIFICATION OF THE DEVICE(S) TO BE EXAMINED**

7.  Several items are held in evidence at the ATF Evidence Room in Denver, Colorado, which were discovered in the possession of Luis Daniel MARQUEZ during an arrest and seized pursuant to federal search warrant.  They are all being held in evidence under case number 788010-21-0010. The items include an iPhone, red color, in a clear case, a Galaxy S7 edge cellular phone, IMEI:

1

8. 359471070901384, and a red thumb drive with letters "DD" on the exterior of the drive, hereinafter and in Attachments A and B the "Device(s)."

9. Your Affiant believes there is probable cause to believe that the Device(s) are or contain evidence, fruits, and instrumentalities of violations of 18 U.S.C § 922(a)(1)(A).  The applied-for warrant would authorize the forensic examination of the Device(s) for the purpose of identifying electronically stored data particularly described in Attachment B.

10. The Device(s) are currently in the lawful possession of the ATF.  They came into the ATF's possession in the following way:

 A. The iPhone, red color, in a clear case, came into ATF's possession pursuant to a federal search warrant.

 B. The Galaxy S7 edge cellular phone, IMEI: 359471070901384, came into ATF's possession pursuant to a federal search warrant.

 C. The red thumb drive with letters "DD" on the exterior of the drive, came into ATF's possession pursuant to a federal search warrant.

Therefore, your Affiant seeks this additional warrant out of an abundance of caution to be certain that an examination of the Device(s) will comply with the Fourth Amendment and other applicable laws.

11. The Device(s) are currently in storage at 950 17th Street, Suite 1700, Denver, CO 80202.  In my training and experience, I know that the Device(s) all have been stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state as they were when the Device(s) first came into the possession of the ATF.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

12. Based on my training and experience, your Affiant knows about the following items, hereinafter and below and in the Attachments "Device(s)."

13. Most cellular telephones are equipped with a digital camera. A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable digital storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media includes various types of flash memory cards and miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos such as texts, word processing documents, or web pages.  If the camera is equipped with global positioning system ("GPS") technology, that information may be recorded as metadata associated with the photographs and videos taken with that camera as well as other information such as the make and model of the camera and the date and time the image was created. Some cameras and removable storage media are now equipped with wireless capabilities, which allow for images and files to be uploaded from the camera or digital storage media directly to the Internet or to other digital storage devices or computers using a wired or wireless connection.

14. A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet including websites, social media sites, bulletin boards, file sharing, and other Internet sites. Wireless telephones often have a subscriber identity module or subscriber identification module ("SIM"), which is an integrated circuit that securely stores the International Mobile Subscriber Identity ("IMSI") and the related key used to identify and authenticate subscribers on mobile telephone devices.

15. A SIM is embedded into a removable "SIM card," which can be transferred between different mobile devices. A SIM card contains a unique serial number ("ICCID"), IMSI, security authentication and ciphering information, temporary information related to the local network, a list of the services to which the user has access, and certain passwords. Most SIM cards will also store certain usage data, such as call history, text ("SMS") messages, and phone book contacts. Such telephones may also contain removable storage media, such as a flash card—such devices can store any digital data, and can have the capacity to store many gigabytes of data. Wireless telephones may also be "smartphones," such that they operate as personal computers capable of accessing the Internet. They operate as GPS navigation devices and can store information about where they have been. They also contain digital cameras. The camera can mark a photo with location data so that upon examination it can be determined where and when a photo was taken. These images can sometimes be recovered even if the user has deleted the image. The smartphone can also connect to the internet using wireless connections, which allow for images, files and other information to be uploaded directly to the Internet or to other digital storage devices or computers. Smartphones also have software, giving them the same capabilities as personal computers including accessing and editing word processing documents, spreadsheets, and presentations. They can also operate as a "tablet," or mobile computer, and can contain software programs called applications. Those programs can perform different functions and save data associated with those functions, including use associated with the Internet. They also operate as personal digital assistants and have contacts and calendar functions. They also can contain media such as music and other files in large quantity.

16. A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are

publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

17. In addition, I know in my training and experience that many other mobile device manufactures have their own version of Touch ID—that is, a fingerprint recognition feature that the device's user can program and use to unlock the device, or facial recognition software–that is, software designed to unlock the phone by holding in front of the device owner's face.  For instance, I know that Google Pixel phones and Google Pixel XL phones have a fingerprint sensor that can be used to unlock the device.  Similarly, Samsung, LG, HTC, and other manufacturers also have devices with fingerprint sensors. I also know that Apple iPhones have facial recognition software capabilities.

18. Similarly, in my training and experience I know that some applications loaded onto mobile devices or other electronic devices may be secured by the user with a thumbprint, fingerprint, or facial recognition.  Common among these types of applications are applications such as mobile banking apps or other financial applications, password storage applications, and secure communications apps, among others.

19. Due to the foregoing, I am informing the court that law enforcement intends to press the fingers (including thumbs) of Luis Daniel Marquez to the Touch ID sensor or other device fingerprint sensor of the seized device, or to hold the Device(s) in front of the face of Luis Daniel Marquez, to the extent a visual inspection of those Device(s) reveals that the device has a fingerprint sensor or facial recognition software enabled—located pursuant to the warrants requested by this Affidavit for the purpose of attempting to unlock the device via Touch ID, other fingerprint sensor, or facial recognition software in order to search the contents (including applications) as authorized by this warrant.

20. Based on my knowledge, training, and experience, your Affiant knows that computers and digital storage devices can store information for long periods of time.  Similarly, things that have been searched for and viewed via the Internet are typically stored for some period of time on a device. This information can sometimes be recovered with forensic tools.

21. Based on my knowledge, training, and experience, examining data stored on computers and digital storage devices can uncover, among other things, evidence that reveals or suggests who possessed or used the computer or digital storage devices.

22. There is probable cause to believe that things that were once stored on the Device(s) may still be stored there, for at least the following reasons:

   A. Based on my knowledge, training, and experience, I know that digital files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a digital storage device or computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

B.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

C.  Wholly apart from user-generated files, computer storage media including digital storage devices and computers' internal hard drives can contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

D.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  Forensic review may also disclose when and by whom the Internet was used to conduct searches, view material, and communicate with others via the Internet.

### *Forensic evidence.*

23. As further described in Attachment B, this application seeks permission to locate not only electronically stored information on the Device(s) that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device(s) were used, the purpose of the use, who used the Device(s), and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device(s) because:

A.  Data on the storage medium can provide evidence of a file that was once on the storage media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer or device was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.  This information can be recovered months or even years after they have been downloaded onto the storage medium, deleted, or viewed.

B.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

C.  A person with appropriate familiarity with how a digital storage device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

D.  The process of identifying the exact electronically stored information on storage media that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer or digital storage device and the application of knowledge about how a computer or digital storage device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

E.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

F.  Your Affiant knows that when an individual uses an electronic device to aid in the commission of a crime, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The electronic device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that an electronic device used to commit a crime of this type may contain calls and voicemails between an individual distributing narcotics and individuals attempting to purchase narcotics ; text messages between an individual distributing narcotics and individuals attempting to purchase narcotics; GPS searches and information associated with traveling in order to distribute narcotics; internet searches pertaining to narcotics and/or firearms; photographs and/or videos exchanged between an individual distributing narcotics and individuals attempting to purchase narcotics; social media apps such as Facebook or Instagram, where the phone owner may be communicating with others regarding narcotics or firearms; email accounts with emails containing communications of drug distribution or firearms.   Additionally, devices are often used to call, text, send photos and email information to criminal associates before, during, and after crimes to assist in the crimes both in planning, executing, and fleeing from the crime scene, and that information is likely contained in the memory of the cell phone.   In addition, people who distribute narcotics are likely to communicate using texts, email, or by phone to arrange for the disposition and or sale of narcotics or to obtain firearms.

G.  Your Affiant also knows that those who engage in criminal activity will attempt to conceal evidence of the activity by hiding files, by renaming the format, (such as saving a .pdf image file as a .doc document file) or by giving them deceptive names such that it is necessary to view the contents of each file to determine what it contains.

***Need to review evidence over time and to maintain entirety of evidence.***

24. Your Affiant recognizes the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches. Your Affiant advises it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis.  Your Affiant has learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops.  In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole. Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original.  In the past, your Affiant has reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations.  Your affiant has learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B.  In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation.  As such, your Affiant respectfully requests the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time.  As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

***Nature of examination.***

25. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, copying and reviewing the contents of the Device(s) consistent with the warrant.  The warrant I am applying for would authorize a later examination and perhaps repeated review of the Device(s) or information from a copy of the Device(s) consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Device(s) to human inspection in order to determine whether it is evidence described by the warrant.

## INVESTIGATION

26.     The United States of America, including the ATF and the Drug Enforcement Administration (DEA), previously conducted a criminal investigation into suspected firearms and drug trafficking activities of LUIS DANIEL MARQUEZ, who was a known drug user and had a previous conviction for a misdemeanor crime of domestic violence, in the Denver, Colorado area.

27.     On November 20, 2020, Adams County SWAT, North Metro Drug Task Force (NMDTF) detectives, DEA agents, and ATF agents executed a search warrant in Commerce City, Colorado. Adams County SWAT located MARQUEZ in the shed, along with multiple firearms, including numerous firearms containing no serial numbers ("ghost guns"), hundreds of rounds of ammunition, firearms manufacturing equipment, firearms parts and accessories and approximately 260 gross grams of suspected methamphetamine.

28.     On November 20, 2020, MARQUEZ was interviewed at the Adams County Sheriff's Office Substation, subsequent to his arrest. MARQUEZ was advised of his Miranda warnings; MARQUEZ waived his rights and agreed to the interview. During the interview, MARQUEZ stated he had been manufacturing AR-15 style rifles and selling them to individuals who could not purchase firearms due to their criminal history.  Additionally, MARQUEZ stated that approximately a week and a half prior to November 20, 2020, MARQUEZ sold an AR-style firearm and approximately one thousand (1,000) rounds of .223 caliber ammunition in exchange for approximately one (1) pound of methamphetamine to an individual named Jorge. MARQUEZ admitted to the SAs the reason he personally makes firearms, instead of purchasing them from a Federal Firearms Licensee, is because he is unable to possess firearms or ammunition due to his previous conviction of a misdemeanor crime of domestic violence. MARQUEZ said that none of the firearms he sells have serial numbers, which are commonly referred to as "ghost guns," because he purchases firearm parts and accessories and has all the equipment he needs to manufacture them into fully functioning firearms.

29.     On May 27, 2021, ATF SAs arrested MARQUEZ at 2002 28th Ave, Apt 3, Greeley, CO 80236, pursuant to a federal arrest warrant.  Marquez had been indicted in the District of Colorado on April 22, 2021, and charged with possession of methamphetamine, illegal possession of firearms, and possession of an unregistered short barreled rifle.  He had an initial appearance on those charges in case number 21-cr-00145-CMA on May 27, 2021, and was subsequently released on bond on June 2, 2021. He remains on bond.

30.     Subsequent to the arrest on May 27, 2021, Connie Martinez, who is the registered owner of a silver Toyota Prius with license plate number CEQ538, which Martinez was in possession of at the time of arrest, and who is also the listed active renter of 2002 28th Ave, Apt 3, Greeley, CO 80236, gave ATF SAs consent to search the vehicle, residence and detached carport storage unit. The arrest of MARQUEZ and the consent search of the above listed vehicle and residence resulted in the following items being recovered:

      a.   Two (2) gross grams of suspected methamphetamine
      b.   Drug paraphernalia
      c.   Two (2) .45 ACP caliber pistols
      d.   Nine (9) rounds of assorted ammunition
      e.   Firearms parts and accessories
      f.   Metal milling tools
      g.   Multiple empty boxes of AR-15 upper receivers
      h.   Multiple empty boxes of AR-15, sixty-five (65) round drum magazines
      i.   Two (2) cellular telephones

31.     On June 4, 2021, a federal search warrant was issued for the two (2) cellular phones recovered on May 27, 2021, belonging to MARQUEZ. The two cellular phones are described as a OnePlus cellular phone, IMEI: 990017120600065, and a Motorola cellular phone, IMEI: 355539116372820.

32.     After a forensic extraction of the content from the cellular phones was completed, the following picture was recovered from one of MARQUEZ's devices showing a purchase order from SafetyHarborFirearms.com. The product purchased is described as a quantity of seven (7) AR-15 short pistol kits, for a total of $1,223.05. The billing address information listed on the purchase order is Saul Escobedo, 5770 29th Street, 116, Greeley, CO 80634, 251-367-0118, saul_escobedo@live.com.



33.     The following picture was recovered from the forensic extraction of the cellular phones belonging to MARQUEZ as described above. The picture is a packing slip for a Polymer80 Starter Kit. Based on my training and experience dealing with firearms manufacturing investigations, I know this to be reference to firearms parts and accessories. The picture of the packing slip showed the parts and accessories were shipped to Saul Escobedo, 5770 29th Street, Apt 116, Greeley, CO 80634. The ship date is listed as April 20, 2021. Based on my training and experience, I know individuals to keep records of their purchases in case items purchased are damaged, not the correct items as ordered, or for various other reasons. I know individuals to keep their records on their person, in their vehicles, or in their residences.



34.     The following pictures were obtained from the forensic examination of the aforementioned cellular phones seized from MARQUEZ subsequent to his arrest from a federal arrest warrant. The pictures appear to be taken at the same location as each other, and show electronic devices being utilized to assist with the manufacturing of firearms.



 

35.     The following pictures were obtained from the forensic examination of the aforementioned cellular phones seized from MARQUEZ subsequent to his arrest from a federal arrest warrant. The pictures appear to be taken at the same location as each other, and show electronic devices being present and likely utilized during the manufacturing and distribution of firearms.



 

36.     The location of the pictures above, is believed to be 2002 28th Ave, Apt 3, Greeley, CO 80236, based on items in the pictures and the surroundings matching the description of the living room area of 2002 28th Ave, Apt 3, Greeley, CO 80236. The following photograph is a still image taken from the entrance video prior to the consent search of 2002 28th Ave, Apt 3, Greeley, CO 80236, as previously described on May 27, 2021.



37.     Also recovered from one of MARQUEZ's phones were lengthy conversations between MARQUEZ and ESCOBEDO JR. on TextNow, a texting and calling application. The telephone communicating with MARQUEZ and ascribed to ESCOBEDO JR. by investigators used 251-367-0118, a telephone number which was included in the contact info for the purchase order in the previous paragraph. Further, according to law enforcement databases, that phone number was registered to Saul Escobedo in February of 2021, and is still registered to him. Based on my training and experience, I know individuals to keep their cellular phones on their person, in their vehicles, or in their residences. In MARQUEZ's telephone, the user of the telephone number ascribed to ESCOBEDO JR is reflected in MARQUEZ's contacts as "Saul." The conversations involved lengthy discussions of purchasing a large amount of firearms parts and accessories, selling firearms for specific prices, and storing firearms and firearms parts and accessories at a storage unit somewhere in the Denver or Greeley metro areas. The following conversations do not represent all conversations that took place between May 6, 2021 and May 27, 2021. Your Affiant included only selective conversations that demonstrate illegal firearms trafficking discussions that took place between MARQUEZ and ESCOBEDO JR. The following discussions are listed chronologically and in verbatim form:

38.     On May 6, 2021, the following discussion took place between MARQUEZ and ESCOBEDO JR.:

   a.   ESCOBEDO JR.: That's the full auto trigger it dont come with more parts?
   b.   ESCOBEDO JR.: Look
   c.   ESCOBEDO JR.: If i get the Glock 17 with this uper how mych can i send it for
   d.   MARQUEZ: Like 1k
   e.   MARQUEZ: That upper is for a 1911 isn't it
   f.   MARQUEZ: Like 1k for the regular ones
   g.   MARQUEZ: Damn I didn't now they made ones like that for glocks
   h.   MARQUEZ: To me that seems like alot to invest in something that only bring a small profit

39.     On May 6, 2021, the following discussion took place between MARQUEZ and ESCOBEDO JR.:

   a.   ESCOBEDO JR.: That AR upper is bad ass how can i buy from them?
   b.   MARQUEZ: I was just showing you how much they go for and we have 20 on them alone we have 12k invested
   c.   ESCOBEDO JR.: Fuck yah, im starting to get impatient with Lancaster Tactical im blowing them up i want them lowers so we can make some money

40.     On May 6, 2021, the following discussion took place between MARQUEZ and ESCOBEDO JR.:

   a.   ESCOBEDO JR.: Hell yah hey how much you sold that uzi andAK for
   b.   MARQUEZ: I haven't yet but around 2-3k each
   c.   ESCOBEDO JR.: Fuck yahLet me know when you're going to go sell them so I can go with you

41.     On May 6, 2021, the following discussion took place between MARQUEZ and ESCOBEDO JR.:

   a.   MARQUEZ: Yea just come thru tomorrow so we can put them together n I might need you to get me a storage

     b.   ESCOBEDO JR.: Okay we can do that would you have the money to morrow in the morning so i can give it to alissa to pay the guy for the windshield she said he would here around 8-9 am

     c.   ESCOBEDO JR.: We still missing the BCGs we should get them on sat

     d.   MARQUEZ: Yea I have it right now but I don't want to hear it from Connie

     e.   ESCOBEDO JR.: Yah no your good just as long as i can pay this guy you know

     f.   MARQUEZ: Should I leave the money up top of the dryer or you want to meet up after I drop off connie

     g.   ESCOBEDO JR.: Umm shes going to work huh you cab leave it there i can pick it up hey the storages did you want to go see them to morrow?

     h.   MARQUEZ:  Yea I want to get one that's near her job

     i.   ESCOBEDO JR.: Around 4pm we going to denver so what time well you be back from taking Connie?

     j.   MARQUEZ: I drop her off at 8am n I'm free until around 5

     k.   ESCOBEDO JR.: Yah there one by Home Depot they ate bad ass

     l.   ESCOBEDO JR.: Okay ku we can go see the storages and move

     m.  some thing in ill get it under my name

42.     On May 8, 2021, the following discussion took place between MARQUEZ and ESCOBEDO JR.:

     a.   MARQUEZ: Can you stop by the storage n get the red case

     b.   MARQUEZ: I don't want Connie to know where it's at or that I even have one

     c.   ESCOBEDO JR.: Okay yah

     d.   MARQUEZ: Thank and I'ma have some money for you this weekend probably Al ur money n then some

     e.   ESCOBEDO JR.: Ok how would it be? So you can start seen what i can get so i can order some thing

     f.   MARQUEZ: I'm not sure yet but if things go right I'll have 3-6 k for you

     n.   ESCOBEDO JR.: Okay fuck yah hopefully everything gos good to get like 6k but yah just let me know by wen do you want the Uzi?

     o.   MARQUEZ: I already have it in Denver

43.     On May 9, 2021, the following discussion took place between MARQUEZ and ESCOBEDO JR.:

     a.   ESCOBEDO JR.: I feel like im missing them plate that are out side of trigger

     b.   MARQUEZ: No it should all be they're

     c.   MARQUEZ: In the storage theyre Is 2 more triggers and thebl rest of the parts to complete it

     d.   ESCOBEDO JR.: Okay where do you have them in? So i can go

     e.   MARQUEZ: In the duffle bag

44.     On May 9, 2021, the following discussion took place between MARQUEZ and ESCOBEDO JR.:

     a.   ESCOBEDO JR.: I have to place the lower receiver order for 100 ones i do that ill see what i got lift and get more thing

     b.   MARQUEZ: Personal ones

     c.   ESCOBEDO JR.: They look bad ass man im starting to get bug with them othere ones have Heard shit from those lowers

     d.   MARQUEZ: Order a few of the skeleton ones on gunbroker

    e.   ESCOBEDO JR.: I well i order if i can like 5 of them

    f.   MARQUEZ: I will be getting money here shortly so we won't be having these problems anymore

    g.   MARQUEZ: Did you get that trigger put on

    h.   ESCOBEDO JR.: Fuck no i couldnt Figure it out i need to seen one put together so I can get it i was going to stop by the Storage to get those other ones you're talking about

45.    On May 17, 2021, the following discussion took place between MARQUEZ and ESCOBEDO JR.:

    a.   MARQUEZ: If you can email fostech to see if they can help with the red assembly of the binary trigger

    b.   ESCOBEDO JR.: What is there wab site is it fostech.com?

    c.   MARQUEZ: Yea

    d.   ESCOBEDO JR.: Do you just want me to ask them if they can send me more infor on how to put the binary trigger kit together

    e.   MARQUEZ: Yea

    f.   ESCOBEDO JR.: Okay i well send them one im trying to get ahold of Ghostgunner too about that 3D

    g.   MARQUEZ: Okay

    h.   ESCOBEDO JR.: Ghost gunner got back to me this is what they said still havnt hurd back about the Trigger assembly yet

    i.   MARQUEZ: Yea so that'll be around oct ,Nov dec

    j.   ESCOBEDO JR.: Yah man i wander how we can stay buys for now to make money

    k.   MARQUEZ: I just need to order some lowers and get a router

    l.   ESCOBEDO JR.: Let me know what i can do to help well right now i cant im broke but wen i get paid ill try to get some too so we can start selling some

46.    On May 19, 2021, the following discussion took place between MARQUEZ and ESCOBEDO JR.:

    a.   ESCOBEDO JR.: Nice fuck hey you think we are going to us that Machine as much? The 3D printer

    b.   MARQUEZ: What do you mean

    c.   ESCOBEDO JR.: Yeah that 3-D printer that we're getting do you think after all this shit goes down we will be using it as much?

    d.   ESCOBEDO JR.: For the lower receivers

    e.   MARQUEZ: Yea bc we going to stock up before anything plus I pay my guy 100 per one that he does so on just those 100 that we already preorder that's 10k that I'ma be saving alone

    f.   MARQUEZ: And that machine does engravings , skeletonizing

    g.   ESCOBEDO JR.: Okay hell yah I haven't heard anything for those lowers are we pre-ordered how long do you think it well take to get them?

    h.   MARQUEZ: They said late June or July

    i.   ESCOBEDO JR.: Yah i was reading thats sick

    j.   ESCOBEDO JR.: Oh okay yah i need to see if i can put a oder in

    k.   ESCOBEDO JR.: To have more pre-ordered

    l.    MARQUEZ: Yea after we get rid of those 100 (200k) and if we run out (which I doubt bc I'ma pre order more) I'll be onto another hustle with all that money I've made with the guns

    m.    ESCOBEDO JR.: Hell yah

47.    On May 21, 2021, the following discussion took place between MARQUEZ and ESCOBEDO JR.:

    a.    MARQUEZ: What's the password to the gate

    b.    ESCOBEDO JR.: Its #3113*

    c.    ESCOBEDO JR.: Waite ite *3113#

    d.    ESCOBEDO JR.: Hey bro did you get the rest of the money?

    e.    MARQUEZ: I'm on. My way for it

    f.    ESCOBEDO JR.: Okay

    g.    MARQUEZ: Where is that place at I Forgot

    h.    ESCOBEDO JR.: 3546 W 29th St, Greeley, CO 80634

48.    On Tuesday July 20, 2021, an ATF SA, while working in an undercover capacity (UC), conducted an undercover transaction with ESCOBEDO JR. While driving in an Undercover Vehicle (UCV), the ATF UC was approaching a residence located at 4712 Lassen Ct. Greeley, CO, and observed a Cadillac sedan parked on the street, a pink sedan in the driveway and a blue Subaru sedan parked on the street. The blue Subaru had a Colorado License Plate with the observable tag SESCO. The Colorado Department of Motor Vehicles has SAUL RAMIREZ ESCOBEDO listed as the registered owner of a 2017 Subaru WRX with a License Plate SESCO. As the ATF UCV parked behind a white Cadillac, the ATF UC observed a Hispanic male only known to law enforcement as FNU LNU in his 20's, standing over 6'00" tall, athletic build with a shaved head and no facial hair, wearing a black jersey with silver numbers and black shorts exit the residence via the front door. Simultaneously, the driver of the blue Subaru, identified as ESCOBEDO JR., exited the blue Subaru and walked to meet FNU LNU. ESCOBEDO JR. and FNU LNU entered the residence and then ESCOBEDO JR. exited via front door as FNU LNU opened the garage door. The UC then parked the UCV in front of the blue Subaru and ESCOBEDO JR. opened the rear passenger door of the blue Subaru carrying two small gun cases and a plastic bag. The UC advised the UC didn't want the cases, so ESCOBEDO JR. removed the firearms and took possession of the cases. The UC inquired if ESCOBEDO JR. built the firearms, he affirmed. The UC confirmed the price of the two firearms which ESCOBEDO JR. stated "32". The UC handed ESCOBEDO JR. $3,200.00 in currency, which he accepted. The UC inquired how long till ESCOBEDO JR. would have more firearms to sell, ESCOBEDO JR. advised approximately one month as there were parts on order. ESCOBEDO JR. advised both firearms sold to the UC were brand new, built by ESCOBEDO JR., and test fired. The UC inquired what the same firearms without any accessories would cost, ESCOBEDO JR. advised $1,400.00 for both pistol and rifle variants. ESCOBEDO JR. pointed out there was no serial numbers on either firearm. The UC advised that the UC was taking the firearms south and that the UC was from Albuquerque, NM and would be bringing both firearms back to Albuquerque after the deal concluded. The UC introduced himself and ESCOBEDO JR. introduced himself as "Saul". ESCOBEDO JR. closed the door and walked back to the garage with FNU LNU.

49.    One of the two firearms purchased from ESCOBEDO JR. on July 20, 2021, is described as an AR-15 type firearm (pictured below), equipped with a forward grip and bearing no serial number or other identifiable markings (as pictured below). On July 26, 2021, a National Firearms Act (NFA) Records Search, identifiable with SAUL RAMIREZ ESCOBEDO JR., was conducted. The query revealed that there were no NFA weapons currently registered to ESCOBEDO JR. in the National Firearms Registration and Transfer Record (NFRTR).



50.     On October 20, 2021, a confidential source (CS) provided criminal intelligence to a NMDTF Detective that MARQUEZ had provided firearms for sale to the CS between June 2021 and October 2021. The CS had previously proven to law enforcement to be a reliable source of information. Conversations between MARQUEZ and the CS, using Facebook Messenger app, showed discussions of firearms sales and purchases subsequent to MARQUEZ's arrest from a federal arrest warrant in May 2021, and while MARQUEZ was on pretrial release. Based on my training and experience, I know individuals to communicate on the Facebook Messenger app by using their cellular phones, tablets, computers, and other electronic devices. I also know individuals to keep their cellular phones, tablets, computers, and other electronic devices on their person, in their vehicles, or in their residences. The following communication does not represent all conversations that took place between the CS and MARQUEZ while MARQUEZ was on pretrial release, and only includes conversations relative to illegal firearms activity. The following Facebook Messenger communication between MARQUEZ and the CS is listed chronologically and in verbatim form.

51.     On or about June 21, 2021, the following discussion took place between MARQUEZ and the CS:

a.   MARQUEZ:



c.   MARQUEZ: 180p
d.   CS: 1800
e.   CS: ????
f.   MARQUEZ: Yea

52. On or about October 20, 2021, the following discussion took place between MARQUEZ and the CS:

    a.  MARQUEZ:



    c.  CS: How much for those
    d.  MARQUEZ: 1500 for both
    e.  MARQUEZ: Or 1400 for each ar
    f.  MARQUEZ:



53.     On October 26, 2021, your affiant was notified by the ATF Firearms and Technology Division (FATD) that the aforementioned firearm purchased on July 20, 2021, purchased in an undercover capacity, can preliminarily be determined as an Any Other Weapon (AOW), as defined in 26 U.S.C. § 5845(a)(5) and 26 U.S.C. § 5845(e), due to the secondary grip.

54.     Specifically, according to 26 U.S.C. § 5845(e), a firearm requiring registration includes "any other weapon," defined as "any weapon or device capable of being concealed on the person from which a shot can be discharged through the energy of an explosive . . . ." This broad definition is limited by excluding, for example, any pistol. "Pistol" is defined as "a firearm which has a short stock and is designed to be held and fired by the use of a single hand . . . ." 18 U.S.C. 921(a)(29). Because the weapon ESCOBEDO JR. possessed, transferred, and made had a vertical foregrip, that firearm was designed to be held and fired by the use of two hands, and is therefore not a pistol. Because that exception and the other exceptions in 26 U.S.C. §5845(e) do not apply, the firearm falls within the definition of "any other weapon," and therefore is required to be registered in the NFRTR.

55.     On October 29, 2021, law enforcement agents observed ESCOBEDO JR exit an apartment located at 5770 29th Street, Greeley, CO 80634, believed to be Unit 116, and enter the driver seat of a 2010 BMW 328, grey color, with License Plate BUZ-H56. This vehicle is registered to SAUL ESCOBEDO JR, according to Colorado's Department of Motor Vehicle records.

56.     On November 1, 2021, law enforcement agents observed the grey 2010 BMW 328 described above, arrive at 2002 28th Ave, Greeley, CO 80236. This is the location where law enforcement previously arrested MARQUEZ pursuant to a federal arrest warrant. Shortly after the grey 2010 BMW arrived at this location, law enforcement agents observed the silver 2012 Toyota Prius, previously described, arrive at 2002 28th Ave, Greeley, CO 80236. MARQUEZ, wearing a black snow hat, an orange shirt, an orange jacket, and dark jeans, exited the driver seat of the silver 2012 Prius. MARQUEZ was then seen interacting with an individual who matched the description of ESCOBEDO JR, who was wearing a white and blue hat with a red bill, a black hoodie, and grey sweatpants. At approximately 4:48 PM on November 1, 2021, the grey 2010 BMW drove away from 2002 28th Ave, Greeley, CO 80236. At approximately 5:10 PM on November 1, 2021, the grey 2010 BMW 328 arrived at 5770 29th Street, Greeley, CO 80634. ESCOBEDO JR exited the driver door of the grey 2010 BMW 328 wearing the same clothing as previously described, and walked towards Unit 116, which is located in an exterior hallway underneath a stairwell in building 1 of The Reserve at West T-Bone apartment complex in Greeley, CO.

57.     On November 2, 2021, a federal warrant was issued for tracking devices to be placed on the grey 2010 BMW 328 and the silver 2012 Toyota Prius described above. Since placement of the tracking devices, the grey 2010 BMW 238 stays overnight during the week at 5770 29th Street, Greeley, CO 80634, which is the current residence known to law enforcement for ESCOBEDO JR. Additionally, since placement of the tracking device, the silver 2012 Toyota Prius stays overnight during the week at 2002 28th Ave, Greeley, CO 80236, which is the current residence known to law enforcement for MARQUEZ.

58.     On November 10, 2021, ESCOBEDO JR was arrested at 5770 29th Street, Greeley, CO 80634, pursuant to a federal arrest warrant. A blue iPhone was seized from his person subsequent to a search incident to arrest. After the arrest and search incident to arrest, ESCOBEDO JR was asked by agents if he wanted to call anyone to inform them he was arrested. ESCOBEDO JR requested to call his place of employment using the cellular phone seized from his person incident to arrest. Agents attempted to utilize facial recognition software to allow ESCOBEDO JR to get access into his phone,

however, facial recognition software was not working. ESCOBEDO JR then asked agents if his wife, Alissa Garza, who exited Unit 116 of the above reference address after the arrest of ESCOBEDO JR, could open his phone using his passcode. Agents then gave the phone to Alissa Garza to utilize the passcode to unlock his phone. Once the cellular phone was unlocked, ESCOBEDO directed agents to the phone number for his place of employment, and placed a phone call to inform his employment he would not be making it into work that day.

59.     On November 10, 2021, MARQUEZ was arrested at 2002 28th Ave, Unit 3, Greeley, CO 80634, pursuant to a federal arrest warrant. After MARQUEZ was arrested, a search of 2002 28th Ave, Unit 3, Greeley, CO 80634 was conducted, pursuant to a federal search warrant for that residence. An iPhone, red color, in a clear case, was located connected to a charger on top of the bed in MARQUEZ's master bedroom. This appeared to be where MARQUEZ was sleeping prior to execution of the previously mentioned search warrant. The a Galaxy S7 edge cellular phone, IMEI: 359471070901384, was located on a shelf of the nightstand next to the bed in MARQUEZ's master bedroom. The red thumb drive with letters "DD" on the exterior of the drive, was located in the attached carport storage room as described in attachment A of the prvious mentioned search warrant. The attached carport storage room included numerous firearms parts and accessories. These electronic devices found in MARQUEZ's residence were seized as electronic items of evidence that could contain historical communications and evidence of 18 U.S.C § 922(a)(1)(A). In my training and experience, I know that electronic devices can contain conversations discussing the acquisition, sale, or transfer of narcotics and firearms, and can help law enforcement identify known and unknown individuals involved in those illegal activities.

60.     Later on November 10, 2021, a federal search warrant was authorized to search the blue iPhone seized from ESCOBEDO JR. The contents of the devices were downloaded and reviewed. The contents of the devices contained, but were not limited to, calendars, call logs, contacts, device locations, chats, instant messages, emails, images, documents, video, audio, and other device information.

61.     After conducting a review of the contents, the following instant message conversation between ESCOBEDO JR and "D" +1 (720) 451-7860, was observed. Based on a review of the complete conversation, the contact "D" in ESCOBEDO JR's phone appears to be a reference to the name "Daniel," who I know to be MARQUEZ due to the specific personal details that only ESCOBEDO JR and MARQUEZ would know. Specifically, Marquez's spouse is the mother of ESCOBEDO JR's spouse.  In otherwise legal parts of the text chain, the two make reference to their spouses in ways that only would apply to this relationship, and therefore shows that the contact "D" must be MARQUEZ.  The following instant messenger communication between ESCOBEDO JR and MARQUEZ is listed chronologically and in verbatim form.

62.     On or about June 21, 2021, the following discussion took place between MARQUEZ and ESCOBEDO JR:

From: saul_escobedo@rocketmail.com _$!<Other>!$_ (owner)
To: +17204517860 D

The address you gave me that's for the homey that has a lower ratepp

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +17204517860 D | | | |

Status: Sent

6/21/2021 7:39:08 PM(UTC-6)

Source Info:
iPhone 12/mobile/Library/SMS/sms.db : 0x1BE1B9C (Table: message, chat, handle; Size: 67801088 bytes)

From: +17204517860 D
To: saul_escobedo@rocketmail.com _$!<Other>!$_ (owner)

Okay my bad i havent been able to tag along  but its for the best atleast for now. That way im covering  ur ass n mine in case they tracking my phone or shit like thaT. And second if anything  does go south, you never  had communication with the other ppl so you have  no involvement watsover

| Participant | Delivered | Read | Played |
|---|---|---|---|
| saul_escobedo@rocketmail.com _$!<Other>!$_ | | 6/21/2021 7:39:41 PM(UTC-6) | |

Status: Read

6/21/2021 7:39:34 PM(UTC-6)

From: saul_escobedo@rocketmail.com _$!<Other>!$_ (owner)
To: +17204517860 D

Ok

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +17204517860 D | | | |

Status: Sent

6/21/2021 7:40:24 PM(UTC-6)

Source Info:
iPhone 12/mobile/Library/SMS/sms.db : 0x1BE1550 (Table: message, chat, handle; Size: 67801088 bytes)

From: +17204517860 D
To: saul_escobedo@rocketmail.com _$!<Other>!$_ (owner)

Yes his going  to give you the third one n let you use his garage to complete the 3 ar. Dont tell him anything about me going to jail or anything  bout any deals i just told him we needed to get rid of 3

| Participant | Delivered | Read | Played |
|---|---|---|---|
| saul_escobedo@rocketmail.com _$!<Other>!$_ | | 6/21/2021 7:41:11 PM(UTC-6) | |

Status: Read

6/21/2021 7:40:59 PM(UTC-6)



63.     After conducting a review of the contents, the following instant message conversation between ESCOBEDO JR and "EL DC7" +1 (970) 415-7573, was observed. Based on a review of the complete conversation, the contact "EL DC7" in ESCOBEDO JR's phone appears to be MARQUEZ due to the specific personal details that only ESCOBEDO JR and MARQUEZ would know. Specifically, in the same way that that the above text chain makes references to the relationship of their spouses, this text chain makes similar references that make clear in context that "EL DC7" is MARQUEZ. The following instant messenger communication between ESCOBEDO JR and MARQUEZ is listed chronologically and in verbatim form.

64.     On or about October 28, 2021, the following discussion took place between MARQUEZ and ESCOBEDO JR:





From: +19704157573 El DC7
To: +19705024710 Saul Escobedo (owner)
To: saul_escobedo@rocketmail.com _$!<Other>!$_ (owner)

**Sounds promising**

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +19705024710 Saul Escobedo | | 10/28/2021 4:01:29 PM(UTC-6) | |
| saul_escobedo@rocketm ail.com _$!<Other>!$_ | | | |

**Status: Read**

10/28/2021 4:01:14 PM(UTC-6)

From: +19705024710 Saul Escobedo (owner)
To: +19704157573 El DC7
To: saul_escobedo@rocketmail.com _$!<Other>!$_ (owner)

**Hell ya on the first Ak you might have to show me how you do it and i can pick up from there**

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +19704157573 El DC7 | 10/28/2021 4:02:49 PM(UTC-6) | 10/28/2021 4:02:52 PM(UTC-6) | |
| saul_escobedo@rocketmail.com _$!<Other>!$_ | | | |

**Status: Sent**

10/28/2021 4:02:49 PM(UTC-6)

From: +19704157573 El DC7
To: +19705024710 Saul Escobedo (owner)
To: saul_escobedo@rocketmail.com _$!<Other>!$_ (owner)

**They**

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +19705024710 Saul Escobedo | | 10/28/2021 4:04:49 PM(UTC-6) | |
| saul_escobedo@rocketm ail.com _$!<Other>!$_ | | | |

**Status: Read**

10/28/2021 4:03:25 PM(UTC-6)













65.     Based on my training and experience, I believe a review of the seized electronic devices will provide agents with evidence of a violation of 18 U.S.C § 922(a)(1)(A).

66.     Further, on 11/29/2021, I searched a website, https://ggd-store.com.  This is the website for a company that procudes 80% percent lowers, and a machine called a ghost gunner 3 CNC machine. That machine, which I believe was referenced by MARQUEZ and ESCOBEDO JR. in their May conversations, automatically finishes 80% lower AR-15-style receivers.  I saw that that machine comes with a thumb drive with programs to run the machine, and I found images of the thumbdrives that look identical to the thumbdrive recovered in this case and specified as the third item in Attachment A.  The website states "included with the GG3: a DD USB with all our latest software."

## **CONCLUSION**

67. Based on the investigation described above, probable cause exists to believe that inside the Device(s) (described on Attachment A), will be found evidence, fruits, and instrumentalities of a violation of 18 U.S.C § 922(a)(1)(A) (described on Attachment B).

68. I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items described in Attachment A for the items listed in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

*s/ Joel Hegarty*
Joel Hegarty, Special Agent
ATF

SUBSCRIBED and SWORN before me this ___30th___ day of November, 2021.

_____
THE HON. NINA Y. WANG
UNITED STATES MAGISTRATE JUDGE

Application for search warrant was reviewed and is submitted by Garreth Winstead, Assistant United States Attorney.